## SINCLAIR REFINING CO. v. STATE TAX COMMISSION et al.

No. 6403.   Decided November 4, 1942.   (130 P. 2d 663.)

See 61 Corpus Juris, Taxation, sec. 732; 25 R. C. L., 1012.

*Charles D. Moore,* of Salt Lake City, for plaintiff.

*Garfield O. Anderson, Grant A. Brown,* and *Wayne Christoffersen,* all of Salt Lake City, for defendants.

LARSON, Justice.

Should taxes on the tank cars, owned by plaintiff and used exclusively by it for transporting its products from refineries and bulk plants to distribution points in the State of Utah, be assessed, levied and collected by the defendant, State Tax Commission, or by the county taxing officials? Plaintiff is engaged in the State of Utah and elsewhere in the oil and gasoline business. In connection therewith it owns and operates in the State of Utah bulk plants, service stations, pumps, tanks, trucks, the tank cars in question, and other facilities for the handling, delivery and sale of said products. In 1941, plaintiff owned and used in the State of Utah seventeen tank cars for the purpose of transporting its petroleum products from refineries to its distribution plants and centers. The cars are moved from point to point over and by the railroads operated in the State of Utah, at plaintiff's request and direction and for its sole use and

benefit. The railroads have no connection with the cars except to move the same over their tracks as directed by plaintiff. The tank cars are not loaned or leased to, or used by any other persons or corporations, nor does plaintiff carry or transport persons or property for hire; and it is not a public utility. The State Tax Commission assumed to assess for taxation purposes said tank cars, and to levy and collect taxes thereon. Plaintiff sought prohibition, contending such property should be assessed by the county assessor and the taxes collected by the county treasurer.

There is thus brought before us for construction and interpretation Section 80-5-3, R. S. U. 1933, reading as follows:

"Pipe lines, power lines and plants, canals and irrigation works, bridges and ferries, and the property of car and transportation companies, when they are operated as a unit in more than one county; all property of public utilities whether operated within one county or more; all mines and mining claims, and the value of metaliferous mines * * *; must be assessed by the state tax commission as hereinafter provided. All taxable property not required by the constitution or by law to be assessed by the state tax commission must be assessed by the county assessor of the several counties in which the same is situated."

This section deals with three classes or types of property—(a) Property which by its situs or nature is operated as a unit in more than one county; (b) Public utilities; and (c) mines and mining claims.

The nub of the case is as to whether plaintiff, as far as its tank cars are concerned comes within the term "car company" as used in the section quoted. The general terms, "car company" and "transportation company" are nowhere defined in the taxing statutes, but we are given a few leads to aid in determining what the legislature meant to include within the terms as used. As to what may be included within such term in a statute depends upon its legislative environment. *State of Ohio* v. *Helvering*, 292 U. S. 360, 370, 54 S. Ct. 725, 78 L. Ed. 1307.

"The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation [or other body or person] within the scope of the law." *United States* v. *Cooper Corporation*, 312 U. S. 600, at 604, 605, 61 S. Ct. 742, 743, 85 L. Ed. 1071.

So we must look to the entire context of the taxing structure with special notice of the places where and when the term has been used. Section 80-6-1, R. S. U. 1933, provides that the Tax Commission shall apportion to the several counties the total assessment of all property assessed by it according to five groups or classes therein set forth as follows: (1) Public utilities, except rolling stock, and all power, canal, and irrigation companies; (2) The rolling stock of railroads and street railroads, except motor driven stock not operated on rails; (3) Automobile and motor driven vehicles not operated on rail, and employed in common carrier business by public utility; (4) Property of car companies; (5) Mines and mining claims. So within these five groups must be found all the types or classes of property in Section 80-5-3, supra. The tank cars in question come within the purview of what we referred to as class (a) of property under Section 80-5-3, which by its situs or nature is operated as a unit in more than one county. But they do not come within subdivisions 1, 2, 3, or 5, of Section 80-6-1, as just set out. If the tank cars are within the assessing power of the Tax Commission it must be under subhead 4, property of a car company, the valuation of which is prorated to the counties in which there is railroad trackage in the proportion that the total trackage in the county bears to the total trackage in the state. This is admitted by the parties, but plaintiff contends that the term car company should be applied only to companies engaged in common carrier business, or as a dispenser and provider of car service to the public. However, the term must mean something different from common carriers, because all such would come under what we have listed as class (b) under

Section 80-5-3, and under subdivision (1) and (2) of Section 80-6-1. It is also noteworthy that subdivision (3), dealing with automobiles and motor transports specifically limits it to common carriers, while subdivision (4), car companies, makes no reference to public service or common carrier or utility. Furthermore Section 80-5-3, expressly lists "car and transportation companies" in a separate class or group from public utilities. It is evident therefore that "car company" means one, not a railroad company, which owns and operates cars used and moved on and over the rails and tracks of railroads or street railways. Such meaning as plaintiff ascribes to the term "car company" would limit it to those furnishing such cars for use of the public generally.

We will explore it somewhat. Prior to statehood, all assessments for tax purposes were made by the county assessors. At statehood the legislature created the State Board of Equalization, and gave it the duty of assessing "all property and franchises owned by railroad, street railway, car, railway depot, telegraph and telephone companies in the State." Section 12 of Chapter CXXIX, Laws of Utah 1896, p. 428, and subdivision 5 of Section 81, p. 447. The assessment record was to show the miles used or available for use in each company in each county. Section 60, p. 441, Laws of Utah 1896.

The Board was also to equalize the assessment of each mortgage, etc., securing a debt affecting property in more than one county. Subdivision 6 of Section 81. The Board apportioned the total assessment of all such property as was assessed by it to the several counties in proportion to the value of such property in each county. Section 56 and Subdivision 6 of Section 81, of Chapter CXXIX, supra. In 1898, the legislature definitely limited the assessing power of the State Board to companies operating in more than one county. Section 2513, R. S. U. 1898. The properties above enumerated at that time were probably the only ones of appreciable value operating in more than one county. Thus

from the first the state established a policy of having a state body assess property and business franchises that were inter county; and apportioned the value thereof to the several counties affected. In 1907 the legislature further emphasized and clarified this policy by amending the statute so as to include as additional property to be assessed by the state board, *electric light, pipe line, power and express companies.* Section 2513, C. L. U. 1907. In 1909 the state board's power was extended to include *canal and irrigating companies* operating in more than one county, and mining claims. Chapter 63 Laws of Utah 1909, c. 63, p. 93. In 1931 by constitutional amendment, Const. art. 13 § 11, the State Board of Equalization was abolished and the State Tax Commission was created. In addition to all duties and powers theretofore vested in and exercised by the State Board of Equalization, the assessing power of the state body was extended to all property of public utilities, and the statutes giving rise to this action were enacted. Chapter 53 Laws of Utah 1931. It is evident that the state policy has been to vest in the state body the assessment of companies regularly operating over or through fixed properties in one or more counties; properties which from their nature or business draw their revenue from more than one county; properties which from their nature require special facilities or knowledge in assessment; and the taxes of which should be prorated or divided among two or more counties. In addition, if such properties were assessed by the county assessors each assessing his portion, different standards may be used, and the total of the various county assessments may be out of all proportion to the value of the property as a whole. Again the counties may be disputing over the amount of property, especially rolling stock subject to tax in each county, and render equalizations impracticable, and the condition of the tax payer impossible.

The policy underlying the taxing setup, above referred to, was noted by this court in *Salt Lake County* v. *Board of Equalization*, 18 Utah 172, 55 P. 378, 379, where this court said:

"This section imposes upon the state board of equalization the duty of assessing all property and franchises of railroads and other companies operated in more than one county. Had the legislature intended property operated in more than one county to be assessed at the principal place of business of such companies, doubtless it would have authorized the county authorities of the county in which such place of business might be situated to make the assessment.

*      *      *

"This section requires the state board to assess the property of railroads and other corporations mentioned operating their lines in more than one county.

*      *      *

"These provisions manifest an intent to give to each county through which a railroad is operated a tax upon the per cent of its rolling stock used within it, in the operation of such road, though its principal place of business may be located in another county.

"The assessment in question is upon the engines and cars of the respective railroads. The tax in question is a property tax, not a tax on business, or for the privilege of operating the railways through the counties; nor is it a tax on the capital stock of the railroad companies.

"The legislature assumed a railway company operating its road in more than one county would use a certain per cent of its engines and cars in each. The number of its engines and cars so used must vary from time to time, but it is the duty of the board of equalization to ascertain or approximate the average number. On that basis the whole assessment on the rolling stock of the respective roads should be apportioned to the various counties. Portions of the entire assessment equal to the assessment upon the average per cent of rolling stock used in the respective counties should be apportioned to each of them."

While that case involved directly the rolling stock of the railroad company, we think the reasons therein stated apply with equal cogency to the cars here involved. That the plaintiff here is a company operating rail cars as a unit in more than one county in its general business is admitted. That such cars are for tax purposes no different from railroad rolling stock is evident. That its value, inseparably connected with its use and business is derived from all counties in which it is used, or may be used, is equally evident. No county can legally be entitled to the benefits of any portion of an assessment on the property

used in another county. *Salt Lake County* v. *Board of Equalization,* supra. Also the assessment by the Tax Commission of such property, situated as it were by its use in more than one county, or operated in more than one county, may fairly be regarded as an act or method of equalizing and adjusting the valuation of property between different counties. *State ex rel.* v. *Eldredge,* 27 Utah 477, 76 P. 337.

We conclude, therefor that the term "car company" as used in the statute in question is broad enough, and was intended to include such situations and property as are involved in the tank cars in question; and they are properly assessable by the State Tax Commission. The alternative writ is recalled and quashed. Costs to defendant.

MOFFAT, C. J., and McDONOUGH, J., and WADE, District Judge, concur.

WOLFE, Justice (concurring).

I concur but I place my concurrence in the order recalling the alternative writ on the ground that it was improvidently issued. Ordinarily, I would express concurrence or dissent on the substantive question since it must sometime be finally resolved, but we have lately indulged in the practice of issuing writs of prohibition on ex parte applications against the Tax Commission and other agencies of government when adequate remedies at law exist for redress of injury due to unwarranted agency action. I think a halt is in order.

The Tax Commission and other governmental agencies are charged with a duty to carry out the functions which the law imposes upon them. Incidental to that duty is the duty preliminarily to interpret the law in order to determine what duties and functions are imposed upon or vested in them. They must pass on the question of their jurisdiction and delineate as best they may in ambiguous cases the scope and extent of their powers. We have our sphere of

action as has the legislature, the other courts, the juries, and administrative agencies. It is, of course, one of our duties to ascertain when any of these agencies steps "out of bounds" but it is neither our province to function for them in their various fields nor interfere with their normal processes even in cases of doubt by a writ which will entirely stop any future action, unless it is clear that such action is unauthorized, *and* unless there is no adequate redress by the ordinary course of law or no adequate method of trying out the question upon which it is claimed the power or lack of it depends. *Mercur Gold Mining & Milling Co.* v. *Spry*, 16 Utah 222, 52 P. 382. When we do otherwise we may prevent for a time the functioning of an agency in matters which we may later determine it was permitted to do and which the law enjoined upon it. In that way we become an instrumentality of obstruction in the processes of government and democracy, rather than an agent for interpretation which is our most important field of action. I could find few better examples to illustrate my point than the instant case. Here the petitioner would not have suffered even if the position it took were all the while correct. It could have paid the tax under protest and tried out the point and obtained the return of its payment and the Tax Commission would not have been delayed in its processes. Taxation proceedings are on a time table. When an agency charged with a series of duties in relation to a taxation plan or program is stopped at the beginning or before the final step in the process of the execution with which it is charged, much public harm may result. But ordinarily little public harm will result if such agency is permitted to proceed and the taxpayer required to pay under protest and then bring an action for the return of his money. Certiorari may not stop these processes if no injunction attends it. The record may be certified up and the agency permitted to proceed the while.

Certainly Sec. 80-11-10, R. S. U. 1933, is expressive of public policy in relation to the restraining of a taxing

agency. It will be noted that the courts are admonished not to restrain

*"the collection* of any tax * * * nor * * * the sale of any property for the nonpayment of the tax, except where the tax, or some part thereof sought to be enjoined, is illegal, or is not authorized by law, or the property is exempt from taxation." (Italics added.)

This section by implication would certainly prevent judicial restraint of steps leading up to collection and sale. What would happen to the whole of our taxing machinery if at any stage of its functioning a taxpayer could by injunction or writ of prohibition, hold up all succeeding steps until the court got around to determining whether the step was legal? Payment under protest is an adequate and speedy remedy. See Bancroft's Code Pleading, Practice and Remedies, Ten Year Supplement, Vol. 5, page 3810, § 5620. Certainly the taxpayer can wait the fulfillment of the process, then pay under protest and use his litigious energies in bringing a suit for recovery, better than the public be delayed in its taxing program, only in many cases to find that in the end the delay was unjustified and perhaps irretrievable. I do not mean to say that there may not be rare cases when the act or step threatened by a taxing agency is so palpably unauthorized as to warrant injunction by writ of injunction in equity, but if there is the least doubt it were better to send the petitioner to his ordinary legal remedies. Also, I do not mean to say that there are not rare cases where the taxing agency while proceeding jurisdictionally may not be delayed while the question of the correctness of its procedure is tested if the situation is such that if permitted it will involve the taxpayer in a position from which he cannot be extricated. *Atwood* v. *Cox*, 88 Utah 437, 55 P. 2d 377; *Mayers* v. *Bronson*, 100 Utah 279, 114 P. 2d 213, 136 A. L. R. 698. But such cases are rare indeed. Ordinarily some method may be found which will not hinder the taxing agency in the course it sincerely believes to be its duty to follow, and will at the

same time preserve to the taxpayer an adequate remedy. Payment under protest was devised in part for this very purpose.

Coming to the conclusion I do, I need say nothing concerning the substantive question. I would not want what I have said above to be interpreted as disagreeing with the conclusion of the main opinion on the substantive question. While the definition of "car company" is left more to the ingenuity of the courts than to legislative exactitude, I can see great practical merit in the Tax Commission assessing moving railroad cars. It would seem as if the legislature should have intended that. The practicality of local county assessors each assessing these cars which really have no county taxation situs is not appealing. The strongest argument which the petitioner advances outside of legislative paucity of definition of "car companies" is that if the definition does not revolve about a public service ingredient, any vehicle of any company used inter-county could equally as well be made taxable by the Tax Commission. The answer is that the law did not do so. Also, I seem to discern some distinction on the one hand between vehicles owned by a company and used solely for the distribution of its own products, but controlled, directed, and operated by the company in the very function of distribution, and on the other hand railroad cars which, though owned by such company, are transported under the direction and supervision of railroad companies and become for such purposes as if part of its own rolling stock. Sec. 80-5-3, R. S. U. 1933, may have intended to put such cars in exactly the same situation as the rolling stock of the railroads as far as method of assessment, and I see good reasons for doing so. To have a local assessor valuing roving tank cars of the Sinclair Refining Company whilst the Tax Commission assessed the same type of car belonging to a railroad company which was little if any more transient, would seem to involve inequality.

I must confess that I cannot get any meaning out of the phrase in Sec. 80-5-3 which reads "when they are oper-

ated as a unit." I think it must be ignored. Nor can I derive more meaning out of the phrase used in the main opinion reading "which by its situs or nature is operated as a unit." The number of cars of the Sinclair Refining Company and companies similarly situated, operating in the State of Utah inter county at different times varies greatly and may seldom consist of the same specific cars. How any changing group of cars with a varying constituency, separately bound for many different and changing destinations can be said to "operate as a unit", I am at loss to understand. If the phrase means that they all operate for the same company in the unitary business of distribution of its own products, it lends even more support to the interpretation of "car company" as embracing that part of the business of a producer which uses its own cars in our state for intercounty distribution of its own products.

PRATT, J., on leave of absence.